AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

**FILED**
SEP 23 2011
AT_____M
STEPHEN R. LUDWIG, CLERK
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

UNITED STATES OF AMERICA

v.

MARTIN J. JONASSEN

**CRIMINAL COMPLAINT**

CASE NO. 2:11 MJ 232

I, LANA SABATA, am a Special Agent with the FEDERAL BUREAU OF INVESTIGATION, and undersigned complainant, being duly sworn state that the following is true and correct to the best of my knowledge and belief.

Between on or about September 10, 2011 and through on or about September 12, 2011, in the Northern District of Indiana and elsewhere, defendant did unlawfully seize, confine, inveigle, decoy, kidnap, abduct, or carry away and hold for ransom or reward or otherwise Jane Doe, a 21 year-old female, by willfully transporting her in interstate commerce in violation of Title 18, United States Code, Section 1201(a).

Between on or about September 13, 2011 and through on or about September 17, 2011, in the Northern District of Indiana, defendant did knowingly use intimidation, threaten, or corruptly persuade Jane Doe, a 21 year-old female, or attempted to do so, or engaged in misleading conduct toward her, with intent to influence, delay, or prevent her testimony in an official proceeding in violation of Title 18, United States Code, Section 1512(b)(1).

I further state that I am a Special Agent with the FEDERAL Bureau of Investigation and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof. ( X ) Yes  ( ) No

_____
Signature of Complainant
Lana Sabata, Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence

September 23, 2011      at    HAMMOND, INDIANA
Date                                             City and State

PAUL R. CHERRY
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

S/Paul R. Cherry
Signature of Judicial Officer

AUSA JILL R. KOSTER

## AFFIDAVIT

I, Lana K. Sabata, being duly sworn, depose and state the following:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and I have been so employed since May of 2008. In October of 2008, I was assigned to the Violent Crime and Major Offender Program in Northwest Indiana. My duties under this program focus on federal violent crime investigations including kidnapping, extortion, major thefts from interstate shipments, interstate transportation of stolen property, bank robberies and crimes against children. Prior to my employment with the FBI, I was a local law enforcement officer in Lincoln, Nebraska, for approximately seven years with experience in general investigations, as well as an undercover narcotics investigator at the local, state and federal level. I have also served in the United States Armed Forces, Air National Guard, 155th Security Forces Squadron, for seven years with active duty deployments overseas. I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered to investigate and make arrests for violations of U.S. criminal laws.

2. What follows are the facts that I believe are necessary to establish probable cause for the issuance of the requested criminal complaint alleging that Martin Jonassen (1) unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away and held for ransom or reward or otherwise Jane Doe, a 21 year-old female, by willfully transporting her in interstate commerce in violation of Title 18, United States Code, Section 1201(a)(1); and (2) knowingly used intimidation, threatened, or corruptly persuaded, Jane Doe, a 21 year-old female, or attempted to do so, or engaged in misleading conduct

        toward her, with intent to influence, delay, or prevent her testimony in an official proceeding in violation of Title 18, United States Code, Section 1512(b)(1).

3. The facts set forth herein are either personally known to me or have been told to me directly by law enforcement officers and others with whom I have worked on this case, including but not limited to the Portage Police Department and other local law enforcement agencies. I have not included in this affidavit each and every fact known to me concerning this investigation.

## LEGAL BACKGROUND

4. Title 18, United States Code, Section 1201(a)(1) provides for federal criminal prosecution of a person who unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holes for ransom or reward or otherwise a person, except in the case of a minor by the parent thereof, when the person is willfully transported in interstate or foreign commerce, or when the mail or any means, facility, or instrumentality of interstate or foreign commerce is used in committing or in furtherance of the commission of the offense.

5. The Seventh Circuit has explained the elements of this offense as follows: "a knowing and willful transport, in interstate commerce, of an unconsenting individual for any purpose." *United States v. Jones*, 808 F.2d 561, 565 (7th Cir. 1986). The court explained further that "any purpose, moral or immoral, satisfies the kidnapping statute . . . ." *Id.* at pp. 565-66 (citing *United States v. Healy*, 376 U.S. 75, 82 (1964); *United States v. Atchison*, 524 F.2d 367, 369-71 (7th Cir. 1975); *see also United States v. Lentz*, 383 F.3d 191, 203 (4th Cir. 2004) (citing *Healy* and explaining that "for ransom, reward or

otherwise" means "for any reason which is of benefit to the defendant"); *United States v. Sensmeier*, 2 Fed. Appx. 473, 476-478 (6th Cir. 2001) (upholding conviction where proven purposes included committing assault).

6. Title 18, United States Code, Section 1512(b)(1) provides for federal criminal prosecution of a person who knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding.

7. "The phrase 'with intent to influence, delay, or prevent testimony' means to act for the purpose of causing any person to change his or her testimony or information in any way or to withhold testimony or information, permanently or only for a period of time. The government is not required to prove that the person to be threatened or intimidated actually felt threatened, or intimidated, or influenced or that there was any actual delay or withholding of that person's testimony." 2A Fed. Jury Prac. & Instr. § 49:05 (5th ed.) (citing *United States v. King*, 762 F.2d 232, 237 (2d Cir. 1985); *United States v. Wilson*, 796 F.2d 55, 57 (4th Cir. 1986); *United States v. Murray*, 751 F.2d 1528, 1534 (9th Cir. 1985)).

### INVESTIGATION

8. The following summary of the events which sparked this investigation was provided to me by Detective Nick Grynovich of the Portage Police Department:

> On September 12, 2011, the Portage Police Department received a call of a naked woman running down US 20 in Portage, Porter County, Indiana, and the woman was being chased by a red Dodge. It was learned that the woman had run into the Liquor Center located at a specific address on US 20. Officer Lisa Duncan was the first to arrive. Officer Duncan observed a subject (later identified as witness

3

Joseph Stanley) standing at the southwest edge of the lot yelling that subjects involved in the incident were in the "maroon car" parked at the front of the liquor store. Officer Duncan observed maroon Dodge Stratus parked in front of the store entrance. The vehicle was occupied by a male subject in the driver's seat (later identified as Martin Jonassen) and the vehicle was moving backwards at that time. Officer Duncan subsequently pulled behind the vehicle attempting to stop it from leaving the scene, and Mr. Jonassen narrowly missed her fully marked squad car as he continued to back up. Jonassen then pulled forward and it appeared to Officer Duncan that he was trying to maneuver around her vehicle. Officer Duncan was then able to block the vehicle in.

Officer Duncan exited her vehicle and saw that there was a female passenger (later identified as [Jane Doe]) inside the Dodge. The female passenger was huddled face up on the passenger's side floor of the vehicle. The male driver exited the Dodge and was ordered to the ground at gunpoint. Martin Jonassen was taken into custody. Martin Jonassen was wearing only a pair of jeans.

Mr. Jonassen kept saying to me that the woman in the car was his daughter. He said she was involved with a sixty-year-old man and he was trying to keep her away from him.

Officer Duncan saw that [Jane Doe] was trying to dress herself in a shirt. She was wearing no other clothing. Officer Duncan saw bruises on [Jane Doe]'s body that appeared to be in various stages of healing and further saw redness on the inside of her right arm. Officer Duncan asked her if she was battered and in need of medical attention and she mumbled an answer. Since she had no clothing on and Mr. Jonassen had very little clothing on, Officer Duncan asked [Jane Doe] if she'd been raped. She nodded in the affirmative but said she'd rather take care of things in Missouri, where she lived. An ambulance was called to tend to [Jane Doe]. [Jane Doe] complained of pain in her arms and showed me the redness on her right arm.

Officer Duncan then spoke with the Liquor Center Clerk, Sandy Farley, who witnessed the incident. Ms. Farley said [Jane Doe] ran into the store naked and stood at the entrance saying, "Help me. Please help me." Farley stated that Martin Jonassen then entered the store chasing after her at which time [Jane Doe] grabbed the doors of a cooler toward the west side of the business, holding on so as not to be pulled from the store. She said Martin Jonassen grabbed [Jane Doe] and pulled her backwards forcefully enough to break her grip on the cooler doors. Farley said in doing so, that Martin Jonassen lost his balance and fell into a circular beer cooler and beer display knocking several items to the ground. Farley said Martin Jonassen regained his balance and tried pulling [Jane Doe] out the front door. Farley stated that [Jane Doe] held onto the door frame briefly before her hands slipped free of the frame and Martin Jonassen pulled her from the store. Farley said she began picking up the items that had fallen and when she again

4

looked toward the front of the store, she saw [Mr. Jonassen and Jane Doe] inside the Dodge. Farley stated that Martin Jonassen had his elbow on [Jane Doe's] chest, pinning her down as her feet were sticking up near the steering wheel.

Liquor Center Assistant Manager Brandon Hatch provided the Portage Police with a DVD showing the above listed events both inside and outside the store. The DVD shows the incidents Ms. Farley described. Martin Jonassen is seen lifting [Jane Doe] off the ground as he tries to free her hands from the cooler inside the store. He forces her into the Dodge just before police arrive at the scene.

Officer Flora Akers spoke with [Jane Doe] at the scene. Officer Akers asked [Jane Doe] why she was running down the street nude and asked her if the male subject is someone she knows. [Jane Doe] advised the male subject was her father, Martin Jonassen, and said he was mad at her because he didn't want her to have sex with a male subject from Missouri. [Jane Doe] said, "My dad forced me to leave with him a few days ago and we arrived at the hotel last night. I saw my chance to escape, so I did." It was determined that they were staying at the Dollar Inn. Officer Akers asked her what she meant by "I had my chance to escape" and she said, "He wouldn't let me leave. He made me come with him against my will. He was in the bathroom, I saw my chance and I took it."

Officer Akers then asked her why she was being held in the room by Martin and asked her why she would have been naked in the room with her father. [Jane Doe] continued to cry and said, "I just want to go home." [Jane Doe] was asked if she had been sexually assaulted by Martin and she turned her head away and did not offer a response. Officer Akers told [Jane Doe] it was not her fault if she was assaulted and asked her if she wanted to talk about it. [Jane Doe] sat silently crying and again said, "I just want to go home."

Officer Akers again asked [Jane Doe] again if she had sex with Martin or if Martin forced her to have sex with him. [Jane Doe] looked at Officer Akers and said, "Can you help me get home?" Officer Akers told her we would do what we could to help her get home, but we needed to figure out what was going on first. Officer Akers again asked [Jane Doe] if her father had sex with her while in the hotel and asked her if they have had sex at any prior time. Officer Akers told her that Martin did not have the right to force or coerce her into any type of sexual act.

[Jane Doe] never said Martin raped her; however, she told Officer Akers, "I just want him to stop doing to me the things he has been doing for years." Officer Akers then asked her if she meant having sex with her and she replied, "Yes." She told me, "I don't want the court to determine his sentence; but I want him to understand he does not have the right to force me into things against my will."

5

[Jane Doe] was also found to have rope around her right ankle and the end of it was frayed and appeared it had been cut. Officer Akers asked [Jane Doe] if Martin had tied her to something in the room and she nodded her head indicating he had. Officer Akers asked [Jane Doe] how she managed to free herself and she replied, "I got loose and saw my chance to escape. I got out of the room and started running...that's when he started chasing me." [Jane Doe] then declined medical attention and said, "Can I just go home now?"

Officer Zosso spoke with a Joseph Stanley who observed [Jane Doe] running naked down US 20. Stanley advised that she appeared to be "running for her life".

Officer Zosso also interviewed two employees from the Dollar Inn, a Patricia Payton and Deborah Brown. Payton works the front desk and Brown is a housekeeper. Payton and Brown both advised that they observed the woman run naked from the specific room at the Dollar Inn. They both observed that the door was left ajar. Both advised that a chair inside the room had rope [draped over] the armrests of the chair.

9. On September 12, 2011, Jane Doe was interviewed by Detective Janis Regnier of the Portage Police Department and the following summary of that interview was provided to me by Detective Regnier:

At approximately 11:00 am on September 12, 2011, Captain Swickard informed Det. Regnier of the ongoing investigation and requested her assistance in serving the pending search warrant.

Upon her arrival on station, she also spoke with Det. Grynovich who asked that she speak with the victim in hopes she would be more comfortable with a female detective. He further briefed her on the investigation to that point.

The interview of [Jane Doe] was digitally recorded. Throughout Det. Regnier's time with her, she refused to speak about any events or incidents of abuse that she had endured prior to September 10, 2011. When she would breach the subject, attempting to ascertain whether or not she'd been sexually assaulted, either after she'd been taken from Missouri or previously in her lifetime, she wouldn't deny that she'd been assaulted, she would simply state, "I don't want to talk about that" and "its all covered in what happened this weekend" and "its too much". Many hours later, she stated she was trying to decide if saying anything would be worth the effort now, because she's already dealt with it and is not sure if she wants other people involved in it. She also repeated several times, that she wants her father to know that what he says and does isn't always right and called him selfish and controlling, trying to force his viewpoint on her and others. However, she did

6

admit to long-term physical abuse, having been beaten by her father with a belt regularly. With any attempts to talk about sexual abuse, she became teary-eyed and would either answer with "I don't want to talk about that", "I'm not going back there" or deflect to another topic entirely. Each time, she never denied having been sexually assaulted, just maintained that what had transpired over the weekend was a shortened version of everything that has happened to her. She'd also made the statement that she thought he had stopped (his previous behavior) and was now going be reasonable about things. Regarding sexual activity, she made the statements, "In my own mind, I'm still a virgin and that's all that counts to me" and "As far as I know, I've not had sex", though she seemed unsure about what I was asking.

When asked about her statements to Officer Ryan that she had in fact been sexually assaulted, she replied that wasn't what she'd said. It appeared she was being literal in what she did or did not specifically say; she hadn't answered verbally whether she'd been raped or sexually assaulted, instead saying she wanted him to stop what he'd been doing to her for years. When Officer Ryan clarified that as "having sex" with her, she replied yes at that time.

In summary of Det. Regnier's interview with [Jane Doe], she stated she was at her home in Gallatin, MO, where she lives in a travel trailer on her mother's property. Her father, Martin Jonassen, had come to the property Thursday or Friday and because her mother refuses to allow him into her home, he slept in her [Jane Doe's] trailer, even though she doesn't like him to. On Saturday, September 10, 2011, she went into town with her father to get ice cream, however he saw a police car, became agitated and took them back to her mother's instead. Once there, she was trying to stay away from him by lying in hay in the barn. Once she thought he had left, she started towards her mother's house to take a shower, where she encountered him exiting the main house. She then headed towards her own trailer intending on hosing off the bug mites she said she got on her while lying in the hay. Her father followed her and she asked him to leave so she could undress to clean herself off. Instead, he began pulling up her shirt and she tried to push him away. They began to "wrestle", during which he stripped her completely naked and then took her into her trailer. She stated she fought so long and so hard she became exhausted and fell asleep. She was unsure if her father was completely dressed at that time, he was not wearing a shirt, but she was not sure if he'd removed his pants. She denied any sexual assault at that time.

[Jane Doe] stated she came to, in her bed with her father telling her she needed to get up and get dressed. She told him she didn't want to go anywhere and he pulled her up, making her get dressed and practically carrying her to the car. She said when she saw some of her clothes in the back seat; she knew they were headed to Michigan because he'd been mentioning recently he wanted to go back there. Throughout her ordeal, she stated she repeatedly asked him to let her go or

7

to return her home, saying, "I made it clear I didn't want to go with him", adding "he took me against my will" many times throughout.

Once they began driving, she attempted to escape by getting out of the car at a busy intersection; however, he grabbed her and pulled her back into the car. After her first escape attempt, Martin tied her hands with "baling twine" he'd had in the car. Throughout the trip from Missouri, she attempted to escape several times, each time he caught her and tied her up again, increasing the ties and including her legs, telling her he would have to keep her tied up if she kept trying to get away. [Jane Doe] stated she continually got the ties off, but as long as she wasn't actively trying to escape, her father allowed her to remain untied - only to be rebound after each escape attempt.

The first night, [Jane Doe] was unsure if they were still in Missouri or in Iowa, they'd stopped on the side of a country road for the night. She stated they "wrestled" again on the ground after an escape attempt, where she suffered numerous cuts, scrapes and bruises from the struggle.

At one point, they purchased food at a McDonald's drive-thru; her hands were bound behind her at the time, but she didn't think it would have obvious. She considered yelling for help then, however reasoned that even if they'd called police, her father would have taken off as soon as she said anything and they would have been gone before anyone could help her.

Upon arrival in Portage, IN, she stated she was tied up when they arrived in the room, with her hands behind her back. While she was still tied up and where he could see her, he took a shower first, and then put her in the shower, removing her bindings. She stated they went right to bed, though she didn't fall asleep right away as she was trying to figure a way out. At one point she woke up in the middle of the night and was going to try going out the window, however, her father woke up and hog tied her hands to her feet behind her back, then attached another piece of twine that he held onto. She was able to maneuver out of the ropes afterwards, and they "wrestled around again".

During the night, her father slept on the side of the bed nearest the door; there was only one bed in the room. The morning of September 12, 2011, her father allowed her to shower again, because "he doesn't like things to stink", the ties were still in place on her ankles, though not connected to each other. She stated her father opened the door to go to the car thinking she was in the shower; she peeked around the bathroom doorframe after she heard the exterior door open and it was at that point she ran naked from the room to the liquor store in search of help.

During [Jane Doe's] interview, there were several bruises visible on her upper arms, when asked about them she said those and a number of others were from

8

her "wrestling" with her father, resisting his efforts to control her and her attempts to get away from him. She briefly showed her lower legs and said there may have been a few scrapes or bruises prior to September 10, 2011, but the majority of any injury now present was from her father "doing what he had to, to keep me with him".

When asked her why her father did this, she said it was because he was upset that she was seeing someone that she met two weeks ago; she would only provide to Det. Regnier that he was older than her, his first name was Tim and that she'd met him at the greenhouse where her mother works.

It should be noted that throughout Det. Regnier's interview with [Jane Doe], even though she would answer questions regarding sex, penetration or rape, it is believed she does not understand the meaning of those words as a normal 21-year-old woman would. She has never been to school and only read things her father allowed, which was mainly religion, government and history. She's only been to a doctor twice in her life, the second time being due to this investigation. At one point, anatomical drawings (of younger kids) were used because [Jane Doe] seemed confused at times as to what was being referr[ed] to when being asked about sex or sexual intercourse. She'd stated she "thinks" a woman gets pregnant by "injection" of semen but refused to talk anymore about it, specifically semen, or define what she meant. When asked if she and her siblings believe the same things as their father, who claims to be a Sovereign Citizen, [Jane Doe] replied that her older sister doesn't have much, if any contact with their father at all, and that she and her brothers are beginning to see that there are "other opinions and viewpoints" and that their father is not always as right as he thinks he is.

At approximately 3:00 p.m. on September 12, 2011, Det. Regnier transported [Jane Doe] to the Porter Hospital, Valparaiso Campus where she underwent a forensic medical exam completed by SANE Nurse Jan Ault. Upon completion of the exam, and with Nurse Ault's assistance, Det. Regnier took digital photographs, both scaled and un-scaled of [Jane Doe's] injuries. She had numerous bruises, cuts, scrapes and lacerations on her arms, legs, breasts, back and upper buttocks. The bruises around her upper arms and on her thighs appeared consistent with being grabbed by someone's hands. Though some appeared to be rather deep, [Jane Doe] never once complained that she was in pain, dismissing these injuries as "nothing".

Det. Regnier spoke briefly with Nurse Ault, who advised in addition to the visible injuries, and though [Jane Doe] denied vaginal penetration, her hymen has a healed tear or transection.

10. Thereafter, Jane Doe met with a SANE Nurse who conducted a forensic medical exam and during that examination, Jane Doe informed the nurse her father, Martin Jonassen, "picked me up & pulled me into the car" (In Gallatin, MO on September 10, 2011). She "kept trying to leave the whole way," adding he would "grab a hold of me & tie me up" each time she tried to escape. She further added her father was "upset" because she began "seeing a guy the past 2 weeks." Regarding the bruises and scrapes present, she stated her father inflicted them on, "He just wouldn't let me go so he did whatever it took to keep me."

11. When talking with the SANE Nurse, Jane Doe continued to deny any vaginal, oral or anal penetration. When asked, she did not deny the occurrence of any inappropriate touching in her genital area with the use of hands, instead she simply stated, "I'm not gonna talk about it." When asked if she was touched in her breast area, again there was no denial, only the refusal to disclose it stating, "I don't wanna talk about that either." Further, the medical records indicated a healed tear or transaction of Jane Doe's hymen at 6 o'clock, with no acute injuries present. Numerous bruises, cuts and scrapes were also noted.

12. Martin Jonassen was arrested on September 12, 2011, and was charged the next day in Porter County Superior Court with two counts of Confinement in violation of Indiana Code 35-42-3-3, a Class C Felony, and one count of Battery in violation of Indiana Code 35-42-2-1, a Class A Misdemeanor. Martin Jonassen was thereafter ordered held on $50,000 and held at the Porter County Jail, Valparaiso, IN. While there, Martin Jonassen had telephone privileges from September 12, 2011, until Saturday, September 17, 2011.

During that time, Martin Jonassen made approximately fifteen (15) calls to his wife and children, including the following described calls.

13. On September 13, 2011, at approximately 4:16 a.m., Martin. Jonassen called the telephone number belonging his wife. During this call, Martin Jonassen talks to a female, believed to be his wife, about having Jane Doe change her story so that he cannot be charged. Martin Jonassen states the following;

> Jonassen: Can you hear me?
> Wife: Yes.
> Jonassen: All right. Would you do me a favor and write something down? Please? Do you have a pencil or something? I only got a couple of minutes.
> Wife: I'm getting one.
> Jonassen: Huh?
> Wife: I'm getting one.
> Jonassen: Okay. Just hurry cause I only got a couple minutes. They're talking like for kidnapping twenty years, you know what I mean?
> Wife: Uh huh.
> Jonassen: But if [Jane Doe] retracts her statement then I can go free, so…
> Wife: So what do you want her to do, tell a lie?
> Jonassen: No, just retract the statement. Say she was scared, that's why she made that statement so all she's gotta do is retract it. She don't have to make a new one or nothing, just retract her statement, if you'd write that down. I said to retract her statement. That's all they got to go on, what she's saying. You know what I mean? Her statement? You know what I mean?
> Wife: Whatever.
> Jonassen: Okay, I appreciate that and tell [Jane Doe] to say just say she was scared was why she said that. Retract her statement, that's all she's gotta do and then they ain't got nothing to get me on cause all they're going on is what she said, you know what I'm saying? Otherwise, kidnapping is twenty years and the kids will be growed up and all that, just wouldn't be right.
> Wife: Well, what you did isn't right anyway.
> Jonassen: I know, I know but anyway I didn't want her running off with that old man, you know what I mean?
> Wife: He's not any older than you.
> Jonassen: Well, anyway, okay we can't discuss that much because I haven't got anytime left so just ask her to retract her statement please. Say she was scared and then tell her she can have the moped, the scooter. Just them three things, did you write them down? Retract the statement, say she was scared and she can have the moped.
> Wife: Yeah

        Jonassen: All right, you'll tell her that as soon as you see her or talk to her?
        Wife: I haven't seen her.
        Jonassen: Huh?
        Wife: I haven't seen her yet.
        Jonassen: What? (recorded voice stating you have one minute left.)
        Wife: No answer.
        Jonassen: What'd you say?
        Wife: I haven't seen her yet.
        Jonassen: No, I know. I think they put her on a bus, sent her back but anyway, I just thought, you know, there's a guy in Michigan more her age that she met up there. His name is Max so I thought, I said at least give him a chance. He's a believer. I don't think this Tim guy is a believer of any kind, so I was just trying....
        Wife: The guy up in Michigan?
        Jonassen: No.
        Wife: Mike?
        Jonassen: No, not Mike, it's, he's, anyway I'll get cut off, but I was just trying to hook her up with him rather than this guy that even isn't a believer. That's really what I was doing but anyway...
        Wife: (inaudible)
        Jonassen: I know, I know I gotta stay out of it completely and I will, so, you know, anyway so just ask her to retract her statement, that way they can't get me for nothing and say she was scared was why she made that statement. So retract her statement and then tell her I'll give her the moped too. Them three things, you got them down?
        Wife: Uh huh. I got them down.
        Jonassen: Read them back to me real quick please cause I'm gonna get hung up here.
        -End of recording.

14.    On September 13, 2011, at approximately 11:40 a.m., Martin Jonassen again called the telephone number belonging his wife. During this call, Martin Jonassen talks to a female, believed to be his wife, asking her to write a letter to Jane Doe for him. Martin Jonassen starts the letter off stating that he is sorry, please forgive him, and "I guess I wanted you all to myself." He goes on to state that Jane Doe can help him with "these serious twenty year federal charges." She can do so in the following ways:

        Jonassen: I'll say this by one, by revoking your statement.
        Wife: Whatever, okay.
        Jonassen: And then after that put it's basically all they've got to go on.

12

> Wife: Marty.....

They continue to talk and later Martin Jonassen states;

> Jonassen: Um, two, by refusing to testify against me.
> Wife: It's up to [Jane Doe]. I'm not going to do nothing.
> Jonassen: I know, it's just ask, that's what I put....
> Wife: [Jane Doe] doesn't want to probably see you again for quite a long time from what it sounds to me like the way you treated her.

Talking continues.

> Jonassen: All right, what's the last thing you've got? Two, by refusing to testify against me?
> Wife: No, I just got by one, that's what you told me.
> Jonassen: Oh, okay by one I told you the first thing was...
> Wife: And then you said that's the only thing they've got to go on.
> Jonassen: Um, by one, revoking your statement.
> Wife: Whatever. Oh, I thought by you meant by your saying..
> Jonassen: By number one. Help me get rid of these charges by one, um what was number one? Okay, by revoking your statement.
> Wife: Uh huh.
> Jonassen: Number two, refusing to testify against me.

They continue to talk and Martin Jonassen states that he will call back later.

15. On September 15, 2011, at approximately 11:42 a.m., Martin Jonassen again called the telephone number belonging to his wife. During this call, Martin Jonassen talks to a male, who is believed to be his son. Martin Jonassen starts off saying he "tried to keep [Jane Doe] from that old guy" whom he believes will tell his daughter not to help him. Martin Jonassen further instructs his son to "Do what you can (offering property and a moped) to make a little a paper saying she was willing to go, we just in a big fight in Portage, Indiana. And then she run down the street and so I was trying to stop her and all that. That way they can't write me up for twenty-years." Jonassen's son then tells his

father that he and his brother talked to the FBI the previous day, to which Martin Jonassen replies:

> Jonassen: Oh, OK and he was trying to find out if I was a rapist or somethin' right?
> Son: Uh huh
> Jonassen: Ya, so you guys covered for me, right?
> Son: I guess. As good as we could.
> Jonassen: Ok, what about her? Is she trying to push something or not?
> Son: Don't know. I haven't talked to her about it yet.

They continue to talk briefly before the call ends, and Martin Jonassen states he will call again later.

16. Thereafter, while remaining in the custody of the Porter County Jail, Martin Jonassen continued to call the phone number belonging to his wife, and mostly spoke to two of his sons. He made 12 such phone calls and during each phone call, he asked his sons to convince Jane Doe to retract her statement, continuing to offer to give her property in exchange for her assisting him in being released from jail.

17. On September 16, 2011, during a call placed at 7:26 p.m., Martin Jonassen dictated to his son the statement he wanted Jane Doe to sign, then requested they have copies made and have it notarized prior to mailing to the Porter County Jail, and provided the address. The dictated statement is as follows: "I, (followed by Jane Doe's initials with instructions to write her name out fully) retract my former statement made under duress, and hereby state I willingly went to Portage, Indiana, then had a disagreement, but my dad never kidnapped, confined, raped or committed battery or attempted any of the above." He referred to this statement, and its importance in having it signed and mailed, in each of the phone calls that followed that call. On several occasions, and specifically during a

phone call made on September 16, 2011, at 7:43 p.m., Martin is believed to have spoken directly to Jane Doe. During that particular call, he changed pronouns when referring to Jane Doe from "her" to "you" but then caught himself and reverted back to "her." Throughout these calls, Martin Jonasson continually asked that Jane Doe retract her statement, adding at one point, "You can't rape somebody that says I wasn't raped."

18. In a call made on September 17, 2011, at approximately 1:04 p.m., Martin Jonassen spoke to his son and asked if he had wrote Jane Doe's statement yet and he replied that he had not and then stated he did not think he would because it would be "a waste of time, [Jane Doe] doesn't want to sign it." Martin Jonassen responded that it was important it gets done by his court date on October 18, 2011. He added it (the charges) will make them "all look like pervs" to which his son stated that there was nothing he can do about it. He then spoke to his other son and told him that it's for the family's honor so they are not all labeled "pervs" that they get Jane Doe to sign the letter retracting her statement.

### PROBABLE CAUSE

19. Based on the above facts, I believe probable cause exists for the issuance of a complaint alleging that Martin Jonassen (1) unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away and held for ransom or reward or otherwise Jane Doe, a 21 year-old female, by willfully transporting her in interstate commerce in violation of Title 18, United States Code, Section 1201(a)(1); and (2) knowingly used intimidation, threatened, or corruptly persuaded, Jane Doe, a 21 year-old female, or attempted to do so, or engaged in misleading conduct toward her, with intent to influence,

delay, or prevent her testimony in an official proceeding in violation of Title 18, United States Code, Section 1512(b)(1).

20. I therefore respectfully request that the attached complaint be issued by the Court.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Lana K. Sabata
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this 23rd day of September, 2011.

**S/Paul R. Cherry**
_____
U.S. Magistrate Judge
Northern District of Indiana

AUSA Jill Koster

16